# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### PINE BLUFF DIVISION

JAMES E. BUTLER
ADC#145762                                                              PETITIONER


VS.                                    5:12CV00200 SWW/JTR


RAY HOBBS, Director,
Arkansas Department of Correction                          RESPONDENT

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge Susan Webber Wright. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party.  Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the United States District Judge, you must, at the same time that you file your written objections, include a "Statement of Necessity" that sets forth the following:

1.   Why the record made before the Magistrate Judge is inadequate.

2.   Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3.   An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Room A149
Little Rock, AR 72201

## I. Background

Pending before the Court is a § 2254 Petition for a Writ of Habeas Corpus filed by Petitioner, James E. Butler. *Doc. #2.* Before addressing Petitioner's habeas claims, the Court will review the procedural history of the case in state court.

2

On September 2, 2009, a Garland County jury convicted Petitioner of two counts of rape of a nine-year-old girl:

> At Butler's trial, S.K. testified that she had known Butler, whom she called "Uncle Jim," since she was about three years old and that she would spend time with him in the summer, including overnight visits. S.K. further testified that during her visits, Butler would touch her "bobo," her word for her vagina, and used toys to touch her "bobo." She stated that he used toys "a bunch" and confirmed that they would go in a little bit. S.K. testified that Butler would put a "gel kinda stuff" that came from a tube on the toys before he used them on her and that the toys would "buzz." S.K. said that she would be in Butler's house or truck when he used the toys on her. S.K. also testified about an incident that occurred when she was on a boat with Butler and his adopted toddler. She stated that he "stuck his wiener inside [her] bobo."

*Butler v. State*, 2010 Ark. 259, 2010 WL 2132266 (May 27, 2010). He received consecutive life sentences. *Id.*

Petitioner appealed to the Arkansas Supreme Court. On May 27, 2010, the Court affirmed. *Butler v. State*, 2010 Ark. 259, 2010 WL 2132266 (May 27, 2010).

On November 23, 2010, Petitioner filed a *pro se* Rule 37 Petition in Garland County Circuit Court, raising numerous postconviction claims. *Doc. #14-3*. On November 30, 2010, the trial court entered an Order dismissing the Rule 37 Petition as untimely. *Docket entry #14-4*. On May 12, 2011, the Arkansas Supreme Court affirmed, holding that the Rule 37 Petition was untimely. *Butler v. State*, 2011 Ark. 218, 2011 WL 1805323  (May 12, 2011).

3

On October 3, 2011, Petitioner filed a *pro se* Petition in the Arkansas Supreme Court requesting that it reinvest the trial court with jurisdiction to consider a Writ of Error *Coram Nobis*. *Doc. #14-6*. On December 15, 2011, the Court issued a decision denying the Petition. *Butler v. State*, 2011 Ark. 542, 2011 WL 6275699 (Dec. 15, 2011).

On June 4, 2012, Petitioner initiated this *pro se* federal habeas action. *Doc. #2*. Petitioner asserts the following habeas claims: (1) counsel was ineffective for failing to adequately investigate his case; (2) insufficiency of the evidence; (3) a speedy-trial violation; and (4) the prosecution withheld exculpatory evidence from the defense. *Docs. #2 and #3*. Respondent argues that all of Petitioner's claims are: (1) barred by the statute of limitations; (2) procedurally defaulted; and (3) fail on the merits. *Doc. #14*.

For the reasons discussed below, the Court concludes that all of Petitioner's habeas claims are barred by the one-year statute of limitations contained in 28 U.S.C. § 2244(d)(1). Thus, the Court recommends that this habeas Petition be dismissed, with prejudice.

## II. Discussion

### A.    The AEDPA's Statute of Limitations

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires a § 2254 habeas petition to be filed within one year of the date on which the state

judgment "became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).

On May 27, 2010, the Arkansas Supreme Court affirmed Petitioner's conviction. Thus, "direct review" concluded ninety days later, on August 25, 2010, when the time expired for Petitioner to seek a writ of certiorari from the United States Supreme Court.[1] *See King v. Hobbs*, 666 F.3d 1132, 1135 (8th Cir. 2012).

The next day, on August 26, 2010, the one-year statute of limitations governing § 2254 habeas actions began to run, and it expired on August 26, 2011. Petitioner initiated this action on May 30, 2012, nine months after the expiration of the limitations period.[2]

## B.    Analysis of Statutory Tolling

The AEDPA provides for statutory tolling for the time during which a "properly filed" petition for collateral review is pending in state court. *See* 28 U.S.C. § 2244(d)(2).

While Petitioner filed a Rule 37 Petition on November 23, 2010, the Arkansas Supreme Court held that it was untimely. Thus, Petitioner is not entitled to any statutory tolling. An untimely post-conviction claim in state court is not

---

[1] In calculating the limitations period, Respondent runs the ninety-day period to file for certiorari from the issuance of the Arkansas Supreme Court's mandate. *Doc. #14 at 3*. However, the ninety days to file a petition for a writ of certiorari runs from the date of the Arkansas Supreme Court's opinion. *See* U.S. Sup. Ct. R. 13.3 ("The time to file a petition for a writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, *and not from the issuance date of the mandate* (or its equivalent under local practice") (emphasis added).

[2] Petitioner placed his petition in the prison mailbox system on May 30, 2012. *Doc. #2 at 15. See Steu v. Dormire*, 557 F.3d 960, 962 (8th Cir. 2009) (applying the "prison mailbox rule" in calculating the habeas statute of limitations).

"properly filed" for purposes of statutory tolling under 28 U.S.C. § 2244(d)(2). *See Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005) ("When a postconviction petition is untimely under state law, that is the end of the matter for purposes of § 2244(d)(2)") (internal quotations and alterations omitted). Furthermore, his state *coram nobis* action had no tolling effect because it was filed *after* the statute of limitations had already run. *See Jackson v. Dormire*, 180 F.3d 919, 920 (8th Cir. 1999) (pendency of state post-conviction proceeding cannot have a tolling effect if it was filed after the expiration of the limitations period).

### C.   Analysis of Whether Petitioner is Entitled to Equitable Tolling

Equitable tolling may allow a habeas petitioner to halt the running of the one-year limitations period in § 2244(d). However, to invoke equitable tolling, a habeas petitioner must show that: (1) he has been pursuing his rights diligently; and (2) some extraordinary circumstance stood in his way and prevented timely filing of his habeas action. *See Holland v. Florida*, 560 U.S. 631 (2010). "[E]quitable tolling is appropriate only under limited circumstances . . . [and] must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes." *Earl v. Fabian*, 556 F.3d 717, 722 (8th Cir. 2009).

In support of equitable tolling, Petitioner asserts that he "was not told by the courts or his public defender" that he could file a Rule 37 action in state court.

*Doc. #16 at 3*. He further states that he immediately filed for Rule 37 relief in state court once he discovered that postconviction relief was available. *Id.*

While Petitioner essentially relies on his *pro se* status and lack of legal knowledge to toll the limitations period, the Eighth Circuit has consistently rejected those arguments. *See, e.g. Johnson v. Hobbs*, 678 F.3d 607, 611 (8th Cir. 2012) (holding that a *pro se* prisoner's misunderstanding of the state court postconviction rules did not warrant equitable tolling); *Earl v. Fabian*, 556 F.3d 717, 724 (8th Cir. 2009) (holding that a *pro se* prisoner's lack of legal knowledge and legal resources did not warrant equitable tolling); *Jihad v. Hvass*, 267 F.3d 803, 806-07 (8th Cir. 2001) (noting that the pre-filing "obstacles faced by many if not most [*pro se*] habeas petitioners" were presumed to have been considered by Congress in enacting a one-year limitations period).

Petitioner also makes the conclusory assertion that a kidney-removal surgery at an unspecified time "slowed down the process." *Doc. #16 at 3-4*. However, Petitioner makes no attempt to explain how his alleged medical condition has disabled him during a substantial part of the limitations period or otherwise prevented him from filing a timely federal habeas petition prior to August 26, 2011. Under well-established case law, Petitioner's allegations are insufficient to warrant equitable tolling. *See Mendoza v. Minnesota*, 100 Fed. Appx. 587, 587-88 (8th Cir. 2004) (the petitioner's equitable tolling claim based on an ankle surgery

and arthritis failed where the petitioner alleged a health condition but "did not show that it had disabled him during substantial part of limitation period") (*citing Rouse v. Lee*, 339 F.3d 238, 248 (4th Cir. 2003)).

### D.    Analysis of the "Actual Innocence" Exception

Finally, Petitioner argues that the "actual innocence" exception to the limitations period is applicable. In *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013), the United States Supreme Court explained that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or, as in this case, expiration of the statute of limitations." The Court went on to "caution, however, that tenable actual-innocence gateway pleas are rare: A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* (*quoting Schlup v. Delo*, 513 U.S. 298, 329 (1995)) (internal quotations and alterations omitted). The actual-innocence exception requires a habeas petitioner to come forward with "new reliable evidence" which was "not available at trial through the exercise of due diligence." *Schlup*, 513 U.S. at 324

Petitioner argues that certain "new evidence" satisfies the actual innocence exception. First, he relies on a report from a nurse's examination of the victim after she came forward with allegations of Petitioner's sexual abuse. *Doc. #3 at 7-11.*

8

He claims that this report was not disclosed to the defense, and points out that the examiner found that "physical laboratory findings of sexual abuse/assault" were "absent." *Doc. #3 at 11*. Importantly, the report itself does *not* establish Petitioner's innocence. The examiner noted that the absence of physical findings of sexual abuse, in relation to the history provided by the victim, was still consistent with the victim's allegations. She concluded her report by stating that: "The majority of children who have been sexually abused (including penetration) will have no medical findings upon examination. Therefore, a 'normal' exam is not only still consistent with the child's disclosure but also expected." *Doc. #3 at 11*.

Furthermore, Petitioner's claim that this report was undisclosed to the defense, and is "new evidence," is unsubstantiated. The victim's mother testified at trial that she took her daughter to the Child Advocacy Center for an interview and a physical exam. *Doc. #14-7 at 6*. Additionally, the nurse who examined the victim and wrote the report *testified at trial* and stated that she did *not* "find any signs of physical abuse." *Court's Ex. A attached hereto, Trial Tr. 451*. Of course, she went on to note that, based on the history of abuse provided by the victim, the absence of such physical findings was consistent with the victim's allegations. *Court's Ex. A attached hereto, Trial Tr. 451-454*.

Nurses and physicians who perform examinations of rape victims routinely prepare reports documenting their findings. It strains credulity to believe that

Petitioner's attorney was not aware of the report and had not reviewed it prior to trial.[3] However, even if the report was not disclosed, the section of the report that Petitioner deems to be so critical, *i.e.*, that "physical laboratory findings of sexual abuse/assault" were "absent," was *explicitly disclosed* to the jury during the testimony of the examining nurse.

Second, Petitioner argues that the prosecution withheld evidence that the victim's father had "admittedly abused" the victim. Contrary to Petitioner's characterization, evidence that the victim's father had abused her was established at trial.[4] Finally, Petitioner has come forward with no evidence that the victim's father in any way admitted or confessed to the crimes for which Petitioner was convicted. Under these circumstances, Petitioner has failed to meet the demanding actual-innocence exception established by the Court in *McQuiggin*.

### III. Conclusion

IT IS THEREFORE RECOMMENDED THAT the Petition for a Writ of Habeas Corpus be DENIED, and this case be DISMISSED, WITH PREJUDICE. IT IS FURTHER RECOMMENDED THAT a Certificate of Appealability be DENIED pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases.

---

[3] If fact, on cross examination it was *defense counsel* who provided the examining nurse with her "notes from the exam," and asked her questions about them. *Court's Ex. A attached hereto, Trial Tr. 454-456*. The cross-examination *strongly suggests* that this document was the report that Petitioner claims was undisclosed.

[4] On cross-examination, the victim's mother testified that, prior to her divorce from the victim's father, he "physically abused" and hit the victim. *Doc. #14-7 at 7*. She "witnessed it and called the police a lot on it." *Id.* The victim's mother answered "no" when asked: "Did [the victim] also tell you that he struck her on her bobo?" *Id.*

Dated this 19th day of March, 2014.

_____
UNITED STATES MAGISTRATE JUDGE

# PROPERTY OF ARKANSAS SUPREME COURT/COURT OF APPEALS

# CR 09    01353

S

V

                                                        **Appellant(s)**

J   James Butler

    **v.**    Garland Circuit
            Hon. John Homer Wright, JUDGE
            CR2008-268 I

                                                        **Appellee(s)**

    State Of Arkansas
J
I
I
            2 Volume Record Lodged
S
J
I
N

T
N
                                        Transcript Filed December 16, 2009
                                        **Leslie W. Steen, Clerk**
                                        By Denise Parks


                            Volume ___2___



180

         MR. GRAHAM:  State calls Marcie Hermann.

         THE COURT:  Ladies and gentlemen, we might go a

    little past twelve (12) with this witness, but she'll

    be fairly brief and we need to get her testimony taken

    now.

              (WITNESS ENTERS COURTROOM)

         THE COURT:  Ms. Hermann, if you'd step up in

    front of the bench, please.

              (WITNESS APPROACHES BENCH)

         THE COURT:  Raise your right hand.

    (WHEREUPON, THE WITNESS WAS SWORN TO TELL THE TRUTH,

THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH.)

         THE COURT:  Okay.  If you'll take the witness

    stand right over here.  Adjust that microphone after

    you're seated, please.

              (WITNESS IS SEATED IN WITNESS CHAIR)

         THE COURT:  When you're ready.

         MR. GRAHAM:  Thank you, Your Honor.

                    MARCIE HERMANN

    HAVING BEEN DULY SWORN, BEING CALLED BY THE STATE OF

ARKANSAS, TESTIFIED AS FOLLOWS, TO-WIT:

                  DIRECT EXAMINATION

BY MR. GRAHAM:

Q    Would you state your name, ma'am?

A    Marcie Hermann.



181

Q    And would you spell your last name for the Court Reporter, please?

A    H-E-R-M-A-N-N.

THE COURT:  Move that mike down a little bit.

It'll be a little easier for you.

(MICROPHONE IS ADJUSTED)

THE COURT:  It's gotta be fairly close.

Thank you.

Q    And what's your occupation, Ms. Hermann?

A    I'm a registered nurse and employed at the Cooper-Anthony Mercy Child Advocacy Center.

Q    And how long have you been so employed?

A    I've been employed for Saint Joseph's since 1998 and I have been over at the center since the end of 2005.

Q    And you said you work for the Cooper-Anthony Mercy Child Advocacy Center, correct?

A    I do.

Q    And what is the Child Advocacy Center?

A    Well, it's a child friendly environment so that when allegations of child abuse come in we're able to work with other agencies and perform forensic interviews, as well as medical exams, and provide advocacy for the children, and just to help them through the process of what they're going through.

Q    And what is your primary responsibility with the Child Advocacy Center?

449

182

A    I'm a nurse examiner and I perform the medical exams on the children.

Q    And I believe you said previously you're a registered nurse, is that correct?

A    That's correct.

Q    And how long have you been a registered nurse?

A    Since 1994.

Q    And what other training and experience besides your nursing background have you had in the area of conducting physical exams on abuse victims?

A    Since I've been at the center, I have had more than a hundred and twenty (120) hours of classroom time of specialized training.  I'm board certified as a S.A.N.E. A. and a S.A.N.E. P., which stands for Sexual Assault Nurse Examiner.  The A is for Adults and adolescents and then the S.A.N.E. P. is for Sexual Assault Nurse Examiner for Pediatrics.

Q    And how many -- do you have any idea of how many exams you've done on kids during your time?

A    It would be more than four hundred (400).

MR. GRAHAM:  Your Honor, we'd offer her as an expert in the area of being a S.A.N.E. sexual abuse nurse.

THE COURT:  She'll be so recognized.

Q    Did you conduct a physical exam on Summer Kazzee?

A    I did.



183

Q    And do you recall what date that happened?

A    I believe it was April the 9th of '08.

Q    And where would that have occurred?

A    That occurred at our center, at the Child Advocacy Center.

Q    And did you find any physical signs of abuse on her?

A    I did not.

Q    And is that unusual?

A    No, it's not.

Q    And why is that not unusual?

A    Well, it's a common myth, really, that a lot of people have, as far as they expect to have injuries if there's been any kind of sexual abuse or even to the point of penetration.  The area that we focus on, and we use a culpa scope which basically magnifies that area up, the genital area anyway; and after they have done numerous research over the last ten (10) years, figured out that more than ninety percent (90%) of the children that have been sexually abused or even to the point of penetration will have normal exams.  You know, another study, you know, documents that the exam of an abused child rarely differs from that of an non-abused child.

The area we focus in on is actually the hymen, and it's just the soft tissue.  One of the common myths I was talking about was a lot of people think that this hymen goes completely over the vaginal opening, but, in fact, it doesn't, it actually just goes around the vaginal opening.  Kinda like a collar on a

184

shirt.  So that's the reason that there -- one reason why there

could also be penetration and not leave any evidence of it.

     The other is that that area down there is a lot like the

skin inside of our mouth.  So if you can think of whenever

you've bit your tongue or bit your cheek really hard, there's

been even bleeding and that sort of thing, you know a few days

later you can look and there's no scarring.  So, typically, you

know, even when there is injury and, you know, by the time that

we see them in the center it has had plenty of time to

completely heal and rarely leaves scars.

Q    And do you remember the specifics of Summer's exam and the

history that was related to you regarding that?

A    What we do is -- what we like to do anyway, and in Summer's

case is to do the forensic interview first so that we can kind

of debrief as a team before and then deem whether it's necessary

to do an exam or not.  And after she was forensically

interviewed, then she had disclosed during then that she had

been vaginally penetrated with a vibrator.

Q    And do you recall the length of time between what the

forensic interview revealed as far as her last contact with her

perpetrator and the date of the exam?

A    The -- it had been since January of '08, was the last

contact, and I didn't see her then until April.

Q    So a three (3) month period?

A    Uh-huh.

452

185

Q   At least?

A   Yes.

Q   Would that give the hymen, if it were damaged, enough time to heal on its own?

A   Oh, most definitely, yes.

       MR. GRAHAM:  Pass the witness.

       THE COURT:  Cross?

       MR. BECKHAM:  Yes, sir.

<u>CROSS EXAMINATION</u>

BY MR. BECKHAM:

Q   Good afternoon, Ms. Hermann.

   Couple of quick questions.

A   Okay.

Q   You were talking about this myth of a common expectation that an abused child would show signs of physical injury.  And that it's very common that a medical exam such as this on an abused child could look very similar if not identical to a medical exam on a non-abused child.  So, essentially, if -- if you were doing an exam on a child and the child said I had not been abused and you saw what you saw with Summer, would it not also be consistent with her not being abused?

A   I'm not sure if I understand.  I don't do any exams on children that haven't got the allegations of abuse.

Q   Okay.  If -- it sounds like it's a -- it's not a catch twenty-two (22), it's almost the opposite.  If you find evidence

186

of abuse, it supports her allegation.

A    Uh-huh.

Q    If you don't find evidence of abuse, it supports her

allegation.

A    That is correct.

Q    So at any point if it also shows that there's no physical

evidence of abuse, is it not consistent with the child not being

abused, just as it's consistent with the child being abused?

A    True.  Yes.

Q    So it's -- it's almost a wash?  It's a tie, essentially?  I

mean it doesn't necessarily show any evidence of abuse at that

point.

A    I wouldn't call it a wash, but yes.

Q    Okay.  Do you have your notes from the -- from the exam?

A    Not with me, no, I don't.

Q    Okay.

             MR. BECKHAM:  Your Honor, may I approach?

             THE COURT:  You may.

Q    Just, if you don't mind, look over those briefly.

             (COUNSEL HANDS DOCUMENTS TO WITNESS)

     Well, let me ask you this.  Do you think those notes would

help refresh your recollection of the exam?

A    Certainly.  I reviewed these before I came.

Q    Oh, okay.  Okay.

     You made note on the medical -- or lack of physical

187

evidence of abuse.

A    Uh-huh.

Q    You discuss a little bit of the hymen and the, I guess,
location, similar to a collar, there was no sign of injury
there.

A    That's correct.

Q    Would your conclusion be different if -- if the facts had
changed?  Meaning your medical reports -- your medical records
indicate that you're looking for digital injury -- or genital
injury based on a foreign object.

A    Uh-huh.  Correct.

Q    Is it correct that your medical records do not say anything
about an allegation of penetration by his penis?

A    That's correct.

Q    Okay.  Would that possibly change your conclusion as far as
seeing any medical injury?

A    That would not change.  You know, penetration, whether it's
with an object or a penis, would have the same.

Q    Were you aware that Mr. Butler had piercings on his
genitals?

A    Yes, I was.

Q    Okay.  That -- but that is not noted in your medical
records, correct?

A    No, the exam was on Summer, not Mr. Butler.

Q    Okay.  I also note that there is a -- well, I'm meaning --

455

188

what I'm getting at is you are aware that there are piercings --

allegation of piercings on his penis?

A    Yes.

Q    Was that not relevant information to put in the medical

records to support or refute possibly injury that you could've -

- that might've been located?

A    I didn't feel that that was part of -- as far as to go back

and to redo the interview or anything like that and to make note

of it in my form, no, I didn't feel like it was necessary.

Q    Okay.  Also on your medical records do you note that -- do

you see that you had noted that she has a history of bipolar and

hallucinations?

A    Yes.

Q    Okay.  Where did you collect that information from?

A    From the mom, Patricia Burgess.

Q    Okay.  Was that before or after the physical exam?

A    Typically how we do the exam is I'll bring the child in,

kind of explain to 'em that we're gonna do a full head to toe

checkup; bring the mom in there, show 'em the culpa scope so

they won't be afraid, make sure they know that there's not gonna

be anything that hurts; and then speak with the mother and

collect a full history, most of the time, before we ever start

the actual checkup.

              MR. BECKHAM:  May I approach the witness?

              THE COURT:  You may.

456

189

(COUNSEL RETRIEVES DOCUMENTS FROM WITNESS)

A    Thank you.

Q    Ms. Hermann, was I correct in understanding that you, when you do the physical exam, that is done after the initial interview?

A    That is the way we like to do it, with certain age children, and that's how it was done in Summer's case. Sometimes we do have other referrals from other agencies in which he interview has already been done, so I may -- we may just -- the medical may be the only service that we provide to some children.

Q    All right.  So Ms. Sanchez interviewed her prior to?

A    That's correct.

Q    Did you get a report or a summary from Ms. Sanchez prior to you doing the physical exam?

A    Not a written report, but we do just debrief and kind of figure out what the allegations are so that I can hopefully do a better exam.

Q    Is it also safe to assume -- and correct me if I'm wrong, I do not want to put words in your mouth -- but if the initial interview by Ms. Sanchez or someone in her position highly supports the lack of abuse, would you still do a physical exam or would you -- is that discretionary?

A    Discretionary, we talk about it as a team.  You know, certainly if we have a child that we feel like is withholding or

451

190

something like that, you know, we can sometimes go and make sure that just they're healthy.  A lot of times we'll have parents that are in and even though there's not been a strong of a disclosure as far as to the point of penetration, but their parent just wants us to make sure their body looks healthy and, so, we'll do it then.

Q    Okay.  And also when you were debriefed by Ms. Sanchez, she did not inform you of Summer having a history of bipolar or hallucinations, is that correct?

A    Not that I recall. I believe I collected that from the mom.

Q    And you did make note of this, and I'm gonna just ask a couple of questions about it.  I asked a really poorly formed question while ago about performing a medical exam on a child who has been abused as opposed to one who has not.  You said you do not do medical exams on children who have not been abused?

A    Well, they have possibly.

Q    Okay.

A    But I'm saying the only children that we see, we take referrals from the hotline and from law enforcement, so there is already an allegation of abuse of some sort to get them into our center.

Q    Okay.  And Ms. Sanchez, the lady who interviewed Summer, is also an employee of the Child Advocacy Center?

A    That's correct.

Q    So the name is fitting, you are a advocate for children

191

correct?

A    Yes.

Q    And you've testified that you do -- a lot of what you do is for forensic purposes?

A    I do collect forensic evidence when necessary, yes.

Q    So it's either for D.H.S. cases or criminal cases, a lot of times?

A    Yes.

Q    Okay.  Thank you.

        MR. GRAHAM:  No further questions for the witness, Your Honor.

        THE COURT:  Thank you, Ms. Hermann.  You are excused.

            (WITNESS LEAVES WITNESS STAND)

        THE COURT:  Ladies and gentlemen, we're going to take our lunch recess.  We will reconvene at 1:30.

        Let me remind you -- our doors will be open by one (1), I'm sure.  Wait through either in the jury room or outside the courtroom but not in the courtroom during this break.

        You're reminded you're not to discuss the case even among yourselves at this point in time.

        So we'll be in recess until 1:30.

        (WHEREUPON, A RECESS WAS HELD AT THE HOUR OF 12:10 O'CLOCK, P.M., AND IN CHAMBERS PROCEEDINGS BEGAN AT 1:29